**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION**

CAROL FILER,                              )
                                          )
                    Plaintiff,            )        05-40038 FDS
                                          )
        vs.                               )
                                          )
PFG OF MINNESOTA, INC.,                   )
                                          )
                    Defendant.            )

**PLAINTIFF'S RESPONSE TO DEFENDANT PFG'S
MOTION TO DISMISS AND FOR SANCTIONS**

Defendant PFG of Minnesota, Inc. ("PFG"), until induced to mend its ways by the filing of FDCPA litigation against it, sent initial demand letters which failed to comply with the disclosure requirements imposed on such letters by 15 U.S.C. §1692g and were confusing, in violation of 15 U.S.C. §1692e. Although another court has denied a Rule 12 motion attacking essentially identical allegations, *Hernandez v. PFG of Minnesota*, 04 C 6998 (N.D.Ill., April 1, 2005) (Appendix A), PFG insists that not only does Ms. Filer's complaint fail to state a claim, but that it is sanctionable for anyone to assert otherwise. This is nothing less than an assertion that the Illinois judge's opinion is sanctionable, and is illustrative of the level of credibility of defendant's motion.

We are unable to state whether PFG's counsel was aware of the Illinois ruling, as they made no effort to confer and narrow issues pursuant to D. Mass. R. 7.1(a), in which event we certainly would have told them of it. PFG's papers do cite the Illinois docket number, and the decision is available through the Northern District of Illinois ECF system.

PFG requests in its conclusion "alternatively, that summary judgment be granted in its favor." Nothing else in PFG's papers addresses summary judgment. This case has just been filed and plaintiff has had no opportunity for discovery. PFG does not state any grounds for summary judgment. PFG offers no affidavit or other supporting evidence. PFG made no attempt to comply with D.Mass. R. 56.1. "A plaintiff does not have to be prepared to meet a summary judgment motion

1

as soon as the complaint is filed." *Oliveri v. Thompson,* 803 F.2d 1265, 1279 (2d Cir.1986). The

request for summary judgment should be disregarded.

## I.    **Standard of Review**

A complaint should not be dismissed for failure to state a claim under Fed. R. Civ.P.

12(b)(6) "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of

his claim which would entitle  him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

In *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514  (2002), the Supreme Court

reemphasized the extremely liberal pleading standard of the Federal Rules of Civil Procedure, noting

that a dismissal of claims is only appropriate in the rarest circumstances:

> Given the Federal Rules' simplified standard for pleading, '[a] court
> may dismiss a complaint only if it is clear that no relief could be
> granted under any set of facts that could be proved consistent with the
> allegations.' [citing *Hishon v. King & Spalding*, 467 U.S. 69, 73
> (1984)].  If a pleading fails to specify the allegations in a manner that
> provides sufficient notice, a defendant can move for a more definite
> statement under Rule 12(e) before responding. Moreover, claims
> lacking merit may be dealt with through summary judgment under
> Rule 56. The liberal notice pleading of Rule 8(a) is the starting point
> of a simplified pleading system, which was adopted to focus
> litigation on the merits of a claim.

Contrary to PFG's argument, Federal complaints need only give notice, not allege

specific facts or include evidence.  In *Walker v. Thompson,* 288 F.3d 1005, 1007 (7th Cir. 2002),

Judge  Posner reiterated the broad notice pleading standard of the federal rules:

> As the Supreme Court has recently reaffirmed [*Swierkiewicz*], and we
> have held time and again [citations omitted], there is no requirement
> in federal suits of pleading the facts or the elements of a claim, with
> the exceptions [] listed in Rule 9.

The law in the First Circuit is now similar, *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374

F.3d 23, 29 (1st Cir. 2004), notwithstanding any pre-*Swierkiewicz* cases such as those cited by PFG.

"At the Rule 12(b)(6) stage, then, it is enough for a plaintiff to sketch a scenario which, if

subsequently fleshed out by means of appropriate facts, could support an actionable claim." *Garrett*

*v. Tandy Corp*., 295 F.3d 94, 105 (1st Cir. 2002). Any ambiguities or doubts concerning sufficiency

of the claim must be resolved in favor of the pleader. *Hishon v. King & Spalding,* 467 U.S. 69, 73

(1984).

Contrary to PFG's argument (PFG Mem., p. 5), under no circumstances is a federal complaint required to include "evidence . . . such as the results of a consumer survey."

The Supreme Court has held that the plaintiff, but not the defendant, is entitled to set forth what set of facts consistent with the allegations of the complaint would sustain a claim. *Pegram v. Herdrich*, 530 U.S. 211, 230 and n. 10 (2000); *accord, Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992). *See also Dawson v. General Motors Corp.*, 977 F.2d 369, 372 (7th Cir. 1992). "This rule is necessary to give plaintiffs the benefit of the broad standard for surviving a Rule 12(b)(6) motion . . . ." *Cushing v. City of Chicago*, 3 F.3d 1156, 1160 (7th Cir. 1993).

On the other hand, if defendant wants to rely on material outside the complaint, it must file a motion for summary judgment after plaintiff has had adequate opportunity for discovery. *Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d. Cir. 2000); *Kopec v. Coughlin*, 922 F.2d 152 (2d Cir. 1991).

## II.    Facts Alleged in the First Amended Complaint[1]

Plaintiff Carol Filer is an individual who resides in Southbridge, MA. (1st AC, ¶ 4) Defendant PFG of Minnesota, Inc. ("PFG") is an Minnesota corporation with an office in Massachusetts. (1st AC, ¶ 5) It is engaged in the business of a collection agency, collecting debts originally owed to others. (1st AC, ¶ 6) It is a debt collector as defined in the FDCPA. (1st AC, ¶ 7)

On or about August 5, 2004, PFG sent plaintiff Carol Filer a collection letter (1st AC, Exhibit A). (1st AC, ¶ 8) The letter sought to collect an alleged defaulted credit card debt incurred for personal, family or household purposes. (1st AC, ¶ 9) Exhibit A was the initial letter plaintiff received from defendant regarding the debts described therein. (1st AC, ¶ 10-11) Exhibit A

---

[1]PFG filed its motion to dismiss on April 7, 2005. On April 8, 2005, plaintiff filed an amended complaint. The amended complaint contains substantially the same allegations as the original complaint but adds an additional claim, pursuant to Mass.G.L., ch. 93A. On April 12, 2005, upon inquiry, PFG's counsel told plaintiff's counsel that he did not know whether PFG, in light of the amended complaint, was going to stand on or amend its motion to dismiss. Because the original complaint and amended complaint are substantially similar, plaintiff references the allegations in the amended complaint.

represents a form letter intended for use by PFG as the initial letter it sends to a consumer. (1st AC, ¶12)

Exhibit A describes the creditor(s) as "Bedford Fair - Tert," states that the addressee owes $424.62 principal and $0.00 interest, and that the $424.62 total "may include other debts not listed here." (1st AC, ¶ 14)  "Tert" is an internal designation or code used by defendant.  Its meaning is not within the knowledge of the "least sophisticated consumer." (1st AC, ¶ 17)

The statement in Exhibit A that the debt includes  no interest is inaccurate. (1st AC, ¶19). Credit card debts are not charged off unless they are at least 30 days past due. Any charged off credit card debt necessarily includes interest. (Id.)

After being placed on notice of the problems with its letter, PFG modified the form to remove the  "May include other debts not listed here" language. (1st AC,  ¶22)

## III.    Plaintiff's Claims

Plaintiff alleges that the "May include other debts not listed here" language used by PFG violated 15 U.S.C. §1692g.  Section 1692g is the "validation notice" provision of the FDCPA, and states:

§ 1692g.        Validation of debts [Section 809 of P.L.]

Notice of debt; contents

(a) Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing–

(1)        the amount of the debt;

(2)        the name of the creditor to whom the debt is owed; . . .

Plaintiff contends that Exhibit A fails to comply with these requirements because a statement of "Bedford Fair - Tert" and an amount coupled with the statement "May include other debts not listed here" does not state the "amount of the debt" or reasonably identify the creditor or creditors to whom the debt is allegedly owed.

4

Plaintiff further contends that the statement in Exhibit A that the debt consists of $424.62 principal and no interest is inaccurate. This misstatement violates the FDCPA as constituting a "false, deceptive, or misleading representation or means in connection with the collection of any debt" (§1692e), a false representation of the "character" of any debt (§1692e(2)(A)), and "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer" (§1692e(10)). "It is unfair to consumers under the FDCPA to hide the true character of the debt, thereby impairing their ability to knowledgeably assess the validity of the debt." *Fields v. Wilber Law Firm*, 383 F.3d 562 (7th Cir. 2004).

Finally, the FDCPA violations are alleged to violate Mass. G.L., ch. 93A. *Barnes v. Fleet Nat'l Bank, N.A.,* 370 F.3d 164, 170 (1st Cir. 2004).

## IV.     Facts Not Alleged in the Complaint, But Improperly Asserted by PFG

In addition to the facts alleged in the first amended complaint, PFG makes several unsupported factual assertions in its memorandum. These include:

1.      "[T]he $0.00 balance in the interest portion reflected the fact that no interest was accruing on the account." (PFG Mem., p. 5) The letter says nothing about interest accruing. Plaintiff contends that "Interest 0.00" means that no already accrued interest is sought to be collected. That is false.

2.      "When sending out the Communication, PFG relied on statements from the underlying creditor, Bedford Fair, which set forth that the balance was made up entirely of principal." (PFG Mem., p. 5) This is nowhere in the complaint, and amounts to an attempt to assert a "bona fide error" affirmative defense, without allegation or proof.

3.      "'Tert' refers to the fact that the account was a tertiary placement, meaning that Bedford Fair had placed the account with two other agencies prior to placing the account with PFG." (PFG Mem., p. 8)  This is not in the complaint, and is certainly not something within the ken of the "least sophisticated consumer," or indeed anyone other than an expert in

5

collection practices or someone engaged in the debt collection business. "Tertiary," whether spelled out or abbreviated, is unlikely to be part of an unsophisticated consumer's vocabulary. That PFG knows what "Tert" means, does not negate the fact that unsophisticated consumers would consider it as a name of a creditor, different from "Bedford Fair."

These assertions are improper and should be disregarded.

## V.    The Fair Debt Collection Practices Act

The FDCPA states that its purpose, in part, is "to eliminate abusive debt collection practices by debt collectors." 15 U.S.C. §1692(e). It is designed to protect consumers from unscrupulous collectors, whether or not there is a valid debt. *Mace v. Van Ru Credit Corp.*, 109 F.3d 338 (7th Cir. 1997); *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998); *Baker v. G.C. Services Corp.*, 677 F.2d 775, 777 (9th Cir. 1982); *McCartney v. First City Bank,* 970 F.2d 45, 47 (5th Cir. 1992). The FDCPA broadly prohibits unfair or unconscionable collection methods; conduct which harasses, oppresses or abuses any debtor; and any false, deceptive or misleading statements, in connection with the collection of a debt. 15 U.S.C. §§ 1692d, 1692e, 1692f. It also requires debt collectors to give debtors certain information. 15 U.S.C. §§ 1692e(11), 1692g.

In enacting the FDCPA, Congress recognized the

> universal agreement among scholars, law enforcement officials, and even debt collectors that the number of persons who willfully refuse to pay just debts is minuscule [*sic*]....    The vast majority of consumers who obtain credit fully intend to repay their debts. When default occurs, it is nearly always due to an unforeseen event such as unemployment, overextension, serious illness, or marital difficulties or divorce.

S. Rep. No. 382, 95th Cong., 1st Sess. 3 (1977), reprinted in 1977 USCCAN 1695, 1697.

Courts in the First Circuit have held that whether a debt collector's conduct violates the FDCPA should be judged from the standpoint of the hypothetical "least sophisticated consumer." *Dolan v. Schreiber & Assocs., P.C.*, 01-10177-MLW, 2002 U.S. Dist. LEXIS 6005, *10 (D.Mass., Mar. 19, 2002), adopted, 2002 U.S. Dist. LEXIS 5998 (D. Mass. Mar. 29, 2002); *Martin v. Sands,* 62 F. Supp. 2d 196, 199-200 (D.Mass. 1999); *Baez-Martinez v. PMS*, 95-1409(CC), 1997 U.S. Dist.

LEXIS 3314, *2 (D.P.R., Feb. 6, 1997); *Maxwell v. Fairbanks Capital Corp. (In re Maxwell)*, 281 B.R. 101 (Bankr. D. Mass. 2002); *Hart v. GMAC Mortg. Corp. (In re Hart),* 246 B.R. 709, 723 (Bankr. D. Mass. 2000). The standard is an objective one—whether the plaintiff or any class member was misled is not an element of a cause of action. "The question is not whether these plaintiffs were deceived or misled, but rather whether an unsophisticated consumer would have been misled." *Beattie v. D.M. Collections, Inc.,* 754 F.Supp. 383, 392 (D.Del. 1991).

Because it is part of the Consumer Credit Protection Act, 15 U.S.C. §§ 1601 *et seq*., the FDCPA should be liberally construed in favor of the consumer to effectuate its purposes. *Cirkot v. Diversified Fin. Services, Inc.*, 839 F.Supp. 941 (D.Conn. 1993).

> The [Consumer Credit Protection] Act is remedial in nature, designed to remedy what Congressional hearings revealed to be unscrupulous and predatory creditor practices throughout the nation. Since the statute is remedial in nature, its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated.

*N.C. Freed Co. v. Board of Governors,* 473 F.2d 1210, 1214 (2d Cir. 1973).

Statutory damages are recoverable for violations, whether or not the consumer proves actual damages. *Bartlett v. Heibl,* 128 F.3d 497, 499 (7th Cir.1997).

The FDCPA encourages consumers to act as "private attorneys general" to enforce the public policies expressed therein. *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 666 (7th Cir. 2001); *Baker,* 677 F.2d at 780; *Whatley v. Universal Collection Bureau,* 525 F. Supp. 1204, 1206 (N.D.Ga. 1981). "Congress intended the Act to be enforced primarily by consumers...." *FTC v. Shaffner,* 626 F.2d 32, 35 (7th Cir. 1980). "Congress painted with a broad brush in the FDCPA to protect consumers from abusive and deceptive debt collection practices, and courts are not at liberty to excuse violations where the language of the statute clearly comprehends them...." *Pipiles v. Credit Bureau of Lockport, Inc.*, 886 F.2d 22, 27 (2d Cir. 1989).

Plaintiff need not prove intent, bad faith or negligence in an FDCPA case. The "FDCPA is a strict liability statute," and "proof of one violation is sufficient to support summary judgment for the plaintiff." *Cacace v. Lucas,* 775 F. Supp. 502, 505 (D.Conn. 1990).

7

**VI.    PFG Did Not Intelligibly State "The Amount of the Debt" or
        <u>"The Name of the Creditor to Whom the Debt Is Owed"</u>**

Section 1692g(a) requires disclosure of, among other things, "the amount of the debt" and "the name of the creditor to whom the debt is owed." While "[t]he statute does not say in so many words that the disclosures required by it must be made in a nonconfusing manner," "the courts, our own included, have held, plausibly enough, that it is implicit that the debt collector may not defeat the statute's purpose by making the required disclosures in a form or within a context in which they are unlikely to be understood by the unsophisticated debtors who are the particular objects of the statute's solicitude." *Bartlett v. Heibl, supra,* 128 F.3d at 500.

The total amount demanded in this case is $424.62. The problem is what debts are included in that amount.

PFG, rather uniquely among debt collectors, qualifies the description of the debt with the statement "Total May Include Other Debts Not Listed Here." Furthermore, it includes in the description of the "creditor," in addition to the actual name of the creditor, here Bedford Fair, a mysterious reference to "Tert".

The effect of the "Total May Include Other Debts Not Listed Here" statement  is to create ambiguity as to exactly what debt(s) PFG is attempting to collect on behalf of what creditor(s). A requirement that the initial collection demand disclose both "the amount of the debt" and "the name of the creditor to whom the debt is owed; . . ." requires that a clearly stated amount be correlated with an identifiable creditor, and that the letter refrain from stating or implying that other, unidentified claims are or may be included in the demand.

The words "Total May Include Other Debts Not Listed Here" imply that the letter seeks, or may be seeking, to collect one or more debts other than the one specifically identified. If a statement that there is unspecified interest and charges in addition to the amount stated, as in *Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, and Clark,* 214 F.3d 872 (7th Cir. 2000), or a suggestion that there is a "current balance" greater than the amount stated, as in *Chuway v. National Action Financial Services*, 362 F.3d 944 (7th Cir. 2004), violates the FDCPA as a matter of law, then

8

a statement implying that there are additional debts included in the amount sought necessarily violates it as well. What §1692g requires is a "statement of the debt." *Miller,* 214 F.3d at 875-76. Vagueness and ambiguity concerning what debts a dollar amount applies to is just as deficient from the standpoint of disclosure as a vague and ambiguous amount attributable to one debt. In each case, the debt collector has failed to provide a definite, unambiguous statement of how much is owed on account of "the" debt.

Prior decisions recognize that a §1692g violation may arise from ambiguity concerning what debts or items are being collected. In *King v. International Data Services*, 01-380-HG-LEK, 2002 U.S. Dist. LEXIS 26427 (D.Haw. Aug. 5, 2002), later opinion, 2002 U.S. Dist. LEXIS 26426 (D.Haw. Oct. 29, 2002), aff'd mem., 2004 U.S.App. LEXIS 11377 (9th Cir., June 7, 2004), a collection agency that collected medical debts included in its demand letter not only the amount of the debt specifically identified in the letter but the amount of prior debts sent for collection and the amount paid thereon, without a specific description of what those debts were. The court held that this practice violated the FDCPA. "The inclusion of past debts is likely to confuse the least sophisticated consumer. . . . Confusion is evident here where there is no relation of the past debts to the debt to Diagnostic Laboratories and no explanation of why other debts are included in the demand letter." (2002 U.S.Dist. LEXIS 26427 at *14)

Similarly, in *Goins v. JBC & Associates, P.C.*, 2005 U.S. Dist. LEXIS 595 (D.Conn. 2005), JBC & Associates, a debt collector, sent to Ms. Goins a collection letter stating that she owed $10,277.56 on a check returned because of insufficient funds. This letter stated that Goins was liable for "'restitution' based upon 'an NSF check(s) written to our above-referenced client,' Wilson Suede & Leather." (2005 U.S. Dist. LEXIS 595 at *16). However, defendant in fact was dunning for collection on 22 separate dishonored checks made to various merchants, and requested payment in a lump sum that included (a) the amount of the dishonored checks, (b) a $25.00 returned check charge for each check, and (c) the maximum amount of damages allowable under Connecticut law for dishonored checks. (Id. at 16-17.)

The *Goins* Court found that the inclusion of the other debts made the letter misleading:

> [T]he amount JBC demanded in its February 17, 2003 letter is grossly misleading.  First, the February 17 letter specified only a debt owed to Wilson Suede & Leather, and nowhere informs plaintiff that the claim is also based on debts owed to other merchants.... (*Goins*, 2005 U.S. Dist. LEXIS 595 at *17.)

Here too,  the debtor does not know who is demanding payment, and in what amounts, based on what she is told in the letter she received.

In *Fields v. Wilber Law Firm, P.C.,* 383 F.3d 562, 566 (7th Cir. 2004), the court held that" It is unfair to consumers under the FDCPA to hide the true character of the debt, thereby impairing their ability to knowledgeably assess the validity of the debt." The debtor had been sent four separate debt collection letters between November of 2002 and February of 2003. Each letter requested payment on a debt of $122.06. However, each of the four collection letters demanded between $388.54 and $395.30; the debt collector had added $250.00 in attorney's fees and costs to the debt. On the collection letters sent to the debtor, the debt collector listed the total amount due, including the attorney's fees, as the "account balance" without itemizing the components of that balance. (383 F.3d at 563).

The Court of Appeals reversed, in part, the District Court's dismissal of the appellant's complaint, on the grounds that "the letters could conceivably mislead an unsophisticated consumer." (383 F.3d at 565-566). The Court specifically held that

> an unsophisticated consumer could reasonably wonder why her bill was now $388.54, even assuming she had saved the original contract that specified she could be charged for attorneys' fees.  It would be difficult for such a consumer to understand how a relatively modest fee for services rendered had tripled in size. *Cf. Johnson v. Revenue Management Corp.,* 169 F.3d 1057, 1060 (7th Cir. 1999) ("Unsophisticated readers may require more explanation than do federal judges; what seems pellucid to a judge, a legally sophisticated reader, may be opaque to someone whose formal education ended after sixth grade.").

> Or, an unsophisticated consumer may have lost the bill and forgotten the amount of the debt completely.  In this circumstance, the debtor (or the debtor's spouse, or someone else paying bills for the debtor)

10

> might logically assume that she simply incurred nearly $400 in charges. By leaving the door open for this assumption to be made, [the debt collector's] letter was misleading because it gave a false impression of the character of the debt. It is unfair to consumers under the FDCPA to hide the true character of the debt, thereby impairing their ability to knowledgeably assess the validity of the debt. One simple way to comply with § 1692e... in this regard would be to itemize the various charges that comprise the total amount of the debt. (383 F.3d at 566)

*See also Owens v. Howe,* 2004 U.S. Dist. LEXIS 22728,*46 (N.D. Ind. 2004) (Cosbey, M. J.) (following *Fields*).

Here, the letter on its face suggests that the amount claimed has "components" – it expressly states that "Total May Include Other Debts Not Listed Here." However, it does not in any way break down the debt between the creditors. It is misleading for the same reason that the *Fields* letters were misleading.

PFG contends that the "least sophisticated consumer" should know enough to disregard the statement "total may include other debts not listed here," because there is only one account number and the amounts given for "principal" and "total" are the same. However, if there are "other debts not listed," why would the letter list the account number or amounts for them? Then they would be "listed," rather than "not listed." How is the reader, sophisticated or not, supposed to know whether the principal/ interest/ cost figure pertains to the one account number listed, or whether PFG is claiming that there is another account also?

Judge Hibbler in the Northern District of Illinois *PFG* case agreed and held that a very similar complaint stated a valid claim. Both the complaint and the decision are in Appendix A.

PFG's deception is compounded by the reference to "Bedford Fair – Tert." Who or what is a "Tert"? PFG states in its memorandum that it means "tertiary placement" rather than the name of an entity, even though PFG put the word under the heading "creditor." PFG appears to seriously contend that the "least sophisticated consumer" must know that "tert" means "tertiary placement," rather than the name of some person or entity that holds a debt allegedly owed by the consumer. This is preposterous.

11

A NEXIS search going back 15 years turned up exactly one reference to "tertiary placement" within 10 words of "debt": A. Clement, "Debt buying and selling: My how you've grown," Commercial Law Bulletin, May-June 2002, Vol. 17, No. 3; Pg. 8-12. (<u>Appendix B</u>) This is a specialty publication issued by the Commercial Law League and intended for debt collection attorneys. Furthermore, the definition in the article appears to differ from that used by PFG.

While the widespread practice of purchasing and selling charged-off consumer receivables described in the article furnishes imperative reason for enforcing the FDCPA requirement that every debt collector identify the owner of the debt in its initial communication, and explains why ambiguity regarding the identity of the creditor is confusing to consumers, it hardly suggests that unsophisticated consumers are chargeable with knowing the meaning of an **abbreviation** for "tertiary placement" in a debt collection letter – not even the term itself.

The reference to "tert" is calculated to cause the least sophisticated consumer to scratch his or her head. *Armstrong v. Rose Law Firm,* 00-2287, 2002 U.S.Dist. LEXIS 4039, *7 (D.Minn. Mar. 7, 2002).

Furthermore, PFG has no right to ask the Court to assume that the person reading the letter knows anything about the debt or its owner. As the Seventh Circuit noted in *Fields, supra,* bills are sometimes paid by "the debtor's spouse, or someone else paying bills for the debtor."(383 F.3d at 566 ) For this reason, "debt collectors must still clearly and fairly communicate information about the amount of the debt to debtors." *Fields, supra,* 383 F.3d at 565.  PFG failed to do so, and violated the FDCPA.

**VII.    Plaintiff Has a Valid Claim Based on the Erroneous Statement**
<u>**That the Amount of Interest Included in the Debt Is Zero**</u>

PFG argues with respect to this claim that "When sending out the Communication, PFG relied on statements from the underlying creditor, Bedford Fair, which set forth that the balance was made up entirely of principal." (PFG Mem., p. 5) This explanation is not in the complaint. Furthermore, the complaint alleges that the debt is a charged off credit card, and credit cards are not charged off until they have gone unpaid for at least 30 days. A debt collector should know that any charged off credit card debt includes some interest.

Regardless of whether PFG's explanation is true, an unsophisticated consumer seeing the reference to zero interest could easily understand it to mean that the debt consisted entirely of the price of the goods purchased on a credit card, and that none of the debt consisted of unpaid interest or finance charges. This is not correct, and treating it as correct could harm a debtor in several ways.

For example, the debt is likely, if properly characterized, to consist of a modest amount of principal and a large amount of interest. Some judges might balk at enforcing such a debt. *Discover Bank v. Owens*, 2003 CVF 20195, 129 Ohio Misc. 2d 71, 2004 Ohio Misc. LEXIS 712 (Sept. 9, 2004). In any event, debtors are more likely to be willing to pay "principal" than a debt consisting largely of interest and fees, particularly years after the fact.

Similarly, the writeoff by the owner of the credit card account of amounts paid to merchants for goods or services or disbursed to the cardholder as cash advances has different tax consequences than not collecting interest. The writeoff of amounts paid for goods or services or disbursed as cash advances may constitute income, if the debtor is solvent and the debt uncontested. Not collecting interest has no tax consequences for the debtor. (IRS Form 1099-C instructions [<u>Appendix C</u>]) Debt collectors often use the threat of adverse tax treatment as a collection device, and the misstatement magnifies the impact of such threats.

PFG says that the amount of unpaid interest is "immaterial to the clarity of the amount owed" (PFG Mem., p. 5) However, §1692e is not limited to misrepresentation or confusion

13

concerning the "bottom line." Under *Field* it is clearly a violation of the FDCPA to represent that a debt does not contain interest, when it does. The obligation of a debt collector to refrain from false statements is not limited to the total amount owed, but extends to all matters relating to the debt, its nature, and its constituent parts. (383 F.3d at 566) ("One simple way to comply with *§ 1692e* and *§ 1692f* in this regard would be to itemize the various charges that comprise the total amount of the debt."); see also *Gearing v. Check Brokerage Corp.*, 233 F.3d 469, 472 (7th Cir. 2000) (debt collector's misrepresentation that it is a subrogee is actionable); *Goswami v. American Collection Enterprise, Inc.*, 377 F.3d 488 (5th Cir. 2004), reh'g denied, 395 F.3d 225 (11th Cir. 2004) (debt collector's misrepresentation of settlement authority actionable). "Debt collectors may not make false claims, period." *Randolph v. IMBS, Inc.*, 368 F.3d 726, 730 (7th Cir. 2004).

## VIII.  Plaintiff Is Not Required to Put Evidence in Her Complaint

PFG insists that plaintiff is required to "present objective evidence of confusion, such as the results of a consumer survey" (PFG Mem., p. 5) and that "No such evidence was presented here" (PFG Mem., p. 6). Defendant suggests that plaintiff was required to provide evidence in her complaint. This is absurd. *Garrett v. Tandy Corp., supra,* 295 F.3d 94, 105 (1st Cir. 2002). Under federal notice pleading, pleading evidence is not merely unnecessary, but inconsistent with the "short and plain statement" requirement of Fed.R.Civ.P. 8. Plaintiff is not required to submit evidence for purposes of a 12(b)(6) motion and is entitled to rest on her pleadings.

The Michigan District Court's decision in *Ezell v. Sherman Acquisition II, LP*, 04-72119 (E.D. Mich. 2005), cited by defendant, was decided on summary judgment, not on a 12(b)(6) motion to dismiss, and did not involve the same cause of action. Plaintiff's counsel therein believe the decision was incorrect, but the defendants settled, so no final resolution will be forthcoming.

Similarly, the several decisions reviewed in *Taylor v. Cavalry Investment*, 365 F.3d 572 (7th Cir. 2004), either were summary judgment dispositions or were treated as such because counsel for the plaintiff stated that he did not want to present extrinsic evidence.

14

Furthermore, some violations are so clear that judgment for the plaintiff based on the text of the letter is proper. Thus, *Miller* was decided as a matter of law in plaintiff's favor. In *Bartlett v. Heibl*, 128 F.3d 497, 501 (7th Cir. 1997), involving a threat to sue within the validation period, the court reversed a judgment for the defendant entered after a bench trial and ordered judgment for the plaintiff. In *Chauncey v. JDR Recovery Corp.*, 118 F.3d 516, 519 (7th Cir. 1997), the court affirmed a summary judgment for plaintiff where the collection letter required action within 30 days after its date, rather than after receipt.

A survey or similar evidence regarding the confusing nature of the letter is not required if the letter contains statements which are facially untrue or contrary to the requirements of the FDCPA, as is the case here. *See Walters v. PDI Mgmt. Servs.,* 1:02-cv-1100-JDT-TAB, 2004 U.S. Dist. LEXIS 13972, *22 (S.D.Ind., April 6, 2004), modified, 2004 U.S. Dist. LEXIS 19570 (S.D. Ind., June 14, 2004) (holding that representation that debt should be disputed by certified mail was false); *Frye v. Bowman, Heintz, Boscia & Vician, P.C.*, 193 F.Supp.2d 1070, 1083-84 (S.D.Ind. 2002) (misstatement in summons form used by collection attorney of rights under Indiana Rules of Trial Procedure). However, if the Court disagrees that the letter is facially noncompliant with the FDCPA, plaintiff is entitled to prove that it is in fact confusing, and to have reasonable opportunity for discovery before having to produce such proof.

## IX.    PFG's Request for Sanctions Is Outrageous

PFG's assertion that "this claim was brought in bad faith and for the purposes of harassment" within the meaning of 15 U.S.C. §1692k(a)(3) is nothing short of outrageous. Plaintiff had done nothing more than assert a claim which another District Judge has held sufficient to withstand a Rule 12 motion. PFG is effectively asserting that the Illinois District Judge's decision is frivolous. Even if this Court should not agree with Judge Hibbler, there *are* legal issues on which reasonable legal minds disagree and there is no controlling authority.

PFG does not suggest that this case was brought for any purpose other than to recover the amounts available under federal and state law when consumers are sent improper collection

letters, or to induce PFG to alter its collection practices (it wasn't). PFG has altered its collection

letters (Appendix D), which further indicates that there was something wrong with them.

On the contrary, it appears that debt collectors whose conduct is flagrantly violative

of the FDCPA are asserting bogus §1692k(a)(3) claims for the purpose of intimidating

unsophisticated and poor consumers who dare to assert their rights. *Horkey v. J.V.D.B. & Assocs.,*

*Inc.*, 333 F.3d 769, 775 (7th Cir. 2003).

## X.    Conclusion

For the reasons stated, PFG's motion should be denied.

Respectfully submitted,

  s/ Daniel A. Edelman
Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Francis R. Greene
EDELMAN, COMBS,
LATTURNER & GOODWIN, LLC
120 S. LaSalle St., Suite 1800
Chicago, IL 60603
(312) 739-4200
(312) 419-0379 (FAX)


  s/ Christopher M. Lefebvre
Christopher M. Lefebvre
LAW OFFICES OF CLAUDE
    LEFEBVRE & SONS
Two Dexter Street
Pawtucket, RI  02860
(401) 728-6060
(401) 728-6534 (FAX)
B.B.O. # 629056

J:\case\pfg-filer13.157\pleading\resp.mtd.wpd

## <u>CERTIFICATE OF SERVICE</u>

I, hereby certify, that on April 12, 2005, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Steven S. Broadley
Posternak, Blankstein & Lund
Email: sbroadley@pbl.com


Christopher M. Lefebvre
Law Offices of Claude Lefebvre & Sons
Email: lefblaw@aol.com


s/Daniel A. Edelman                    

17

# APPENDIX A

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 6998 | **DATE** | April 1, 2005 |
| **CASE TITLE** | Hernandez v. PFG of Minnesota, Inc. | | |

**DOCKET ENTRY TEXT:**

Plaintiffs' motion to strike documents attached to defendant PFG's reply in support of motion for judgment on the pleadings is GRANTED (doc. 10); PFG's motion for judgment on the pleadings or alternatively summary judgment is DENIED (doc. 14).

■[ For further details see text below.]    *Wm. J. Hibbler*

Docketing to mail notices.

---

## STATEMENT

Hernandez brought suit against PFG for alleged violations of the Fair Debt Collection Practice Act (FDCPA), 15 U.S.C. § 1692 *et seq.* Hernandez claims that the dunning letter his wife received violates the FDCPA, § 1692g, because the statement, "total may include other debts not listed here," together with the stated zero interest balance and the reference to "Fingerhut/Jefferson Capital," inadequately and inaccurately states the amount of debt and name of the creditor to whom the debt is owed, thus confusing the average, unsophisticated consumer. PFG now moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12 (c), arguing that the facts Hernandez alleges in his complaint do not, as a matter of law, constitute violations of the FDCPA. Hernandez subsequently filed a motion to strike the documents attached to PFG's reply brief.

In ruling upon a 12 (c) motion, the Court accepts the truth of the allegations in the plaintiff's complaint, and the Court may not grant the motion unless the plaintiff could prove no set of facts consistent with the allegations that might support her claim for relief. *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 606 (7th Cir. 2004). Rule 12 (c) gives the court the option to consider matters outside of the pleadings, thus changing the motion into one for summary judgment, provided that the parties have the opportunity to present all pertinent material. *See Craigs, Inc. v. Gen. Elec. Capital Corp.*, 12 F.3d 686, 692 (7th Cir. 1993). The Court will not, in this case, consider matters outside the pleadings, because discovery is far from completed, and Hernandez had not had the opportunity to present all pertinent material. PFG's attempt to "complete" discovery by attaching answers to discovery requests to its reply brief is improper. Thus, Hernandez's motion to strike is GRANTED.

| | Courtroom Deputy | |
|---|---|---|

## STATEMENT

Furthermore, PFG's attempt to convert its motion into a motion for summary judgment also fails, because there is a material issue of fact here. Hernandez's complaint alleges that PFG's dunning letter was illegally confusing to consumers in violation of the FDCPA, and PFG disputes this allegation. The Seventh Circuit holds that whether a dunning letter is confusing under the FDCPA is an issue of fact, and the plaintiff must be given the opportunity, "in any but the clearest case," to present objective evidence of confusion. *Taylor v. Cavalry Inv., L.L.C.*, 365 F.3d 572, 575 (7th Cir. 2004). Hernandez, however, has not been given the opportunity to present extrinsic evidence of confusion. Therefore, PFG's motion for judgment on the pleadings is DENIED.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FERNANDO HERNANDEZ,
individually and  as next friend of
KATHERINE E. HERNANDEZ,

        Plaintiff,

       v.

PFG OF MINNESOTA, INC.,

        Defendant.



## COMPLAINT – CLASS ACTION

## INTRODUCTION

1.    Plaintiff Fernando Hernandez, suing individually and as next friend of his wife
Katherine E. Hernandez, brings this action to secure redress against unlawful credit and collection
practices engaged in by defendant PFG of Minnesota, Inc. ("PFG").  Plaintiffs allege violation of
the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA")

## JURISDICTION AND VENUE

2.    This Court has jurisdiction under 28 U.S.C. §§1331, 1337 and 15 U.S.C.
§1692k (FDCPA).

3.    Venue and personal jurisdiction over defendant in this District is proper
because:

       a.    Plaintiffs reside  here;

       b.    Defendant transacts  business here;

       c.    Defendant's collection communications to plaintiffs and numerous

1

others were transmitted into the District.

## PARTIES

4.     Plaintiff Katherine E. Hernandez is an individual who resides in Lockport, Illinois.

5.     Plaintiff Fernando Hernandez is an individual who resides in Lockport, Illinois, and is the husband of plaintiff Katherine E. Hernandez. Due to a physical disability, Mrs. Hernandez has signed a limited power of attorney, appointing Mr. Hernandez as her attorney-in-fact with authority to act on her behalf in matters relating to civil actions and litigation. A copy of this power of attorney is attached as Exhibit A. As a result, Fernando Hernandez deals with mail sent to his wife Katherine.

6.     Defendant PFG of Minnesota, Inc. is an Minnesota corporation. Its principal place of business is located at 7825 Washington Avenue South, Suite 410, Minneapolis, MN 55439.

7.     PFG of Minnesota, Inc. is engaged in the business of a collection agency, collecting debts originally owed to others.

8.     PFG of Minnesota, Inc. is a debt collector as defined in the FDCPA.

## FACTS

9.     On or about Sept. 3, 2004, defendant sent plaintiff Katherine E. Hernandez the collection letter attached as Exhibit B, seeking to collect a credit card debt incurred for personal, family or household purposes. Plaintiff Fernando Hernandez received it shortly thereafter.

10.     Exhibit B is the first letter plaintiffs received from defendant in connection with the debt described therein.

11.     On information and belief, Exhibit B is the first letter defendant sent to

2

plaintiff Katherine E. Hernandez in connection with the debt described therein.

12.    On information and belief, Exhibit B is a standard form letter intended for use as an initial demand letter by defendant.

13.    The code 1CSPINN01A in the lower right portion of the letter is a designation placed thereon by a mass mailer.

## VIOLATION ALLEGED

14.    Exhibit B refers to a debt allegedly due to "Fingerhut/ Jefferson Capital," gives an amount for that debt, and then adds: "Total May Include Other Debts Not Listed Here."

15.    The "validation notice" provision of the FDCPA, 15 U.S.C. §1692g, provides:

§ 1692g.    Validation of debts [Section 809 of P.L.]

### Notice of debt; contents

(a) Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing--

(1)    the amount of the debt;

(2)    the name of the creditor to whom the debt is owed; . . .

16.    As a result of the statement "Total May Include Other Debts Not Listed Here," Exhibit A fails to coherently state either the amount of the debt or the name of the creditor to whom the debt is owed.

17    Exhibit B fails to comply with these requirements regardless of whether PFG is attempting to collect any debts other than the one specifically identified, and regardless of whether the amount stated is the correct amount of the debt that is specifically identified. The qualification included in the form letter prevents the consumer from knowing what debts PFG is attempting to

3

collect, or what PFG contends the amounts of those debts are.

18.    In addition, <u>Exhibit B</u> states that the "principal" owed is $1074.23 and the "interest" is $0.00.

19.    Assuming that the numbers pertain solely to a Fingerhut/ Jefferson Capital debt, the statement that the alleged debt consists of $1074.23 principal and zero interest is not accurate.

20.    Based on the normal practices of the creditor with respect to its credit card debts, a significant portion of the debt consists of interest, including interest accrued after the debt became delinquent and/or charged off.

21.    Misstating the proportion of the debt that consists of principal and interest has several harmful effects on the debtor:

a.    The debt is likely, if properly characterized, to consist of a modest amount of principal and a large amount of interest. Some judges might balk at enforcing such a debt. In any event, debtors are more likely to be willing to pay "principal" than a debt consisting largely of interest and fees, particularly years after the fact.

b.    The writeoff by the owner of the credit card account of amounts paid to merchants for goods or services or disbursed to the cardholder as cash advances has different tax consequences than not collecting interest. The writeoff of amounts paid for goods or services or disbursed as cash advances may constitute income, if the debtor is solvent and the debt uncontested. Not collecting interest has no tax consequences for the debtor. Debt collectors often use the threat of adverse tax treatment as a collection device, and the misstatement magnifies the impact of such threats.

4

c.    Credit counseling services have standing arrangements to reduce interest, but not principal. The misstatement tends to thwart such arrangements.

d.    If the transaction is subject to state usury laws, the collection of interest on unpaid interest may be a violation. Characterizing the amount as principal disguises this violation.

e.    Debt collectors frequently quote a large amount and then offer a "settlement" of x% of the amount "due." If the quoted amount is inflated through the addition of unauthorized interest, the benefits of the "settlement" are in substantial part illusory.

22.    The misstatement that the debt includes no interest violates the FDCPA as constituting a "false, deceptive, or misleading representation or means in connection with the collection of any debt" (§1692e), a false representation of the "character" of any debt (§1692e(2)(A)), and "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer" (§1692e(10)). "It is unfair to consumers under the FDCPA to hide the true character of the debt, thereby impairing their ability to knowledgeably assess the validity of the debt." Fields v. Wilber Law Firm, 383 F 3d 562 (7th Cir., Sept. 2, 2004), at *9-10.

## CLASS ALLEGATIONS

23    Plaintiff Fernando Hernandez brings this action on behalf of a class, consisting of (a) all natural persons with Illinois addresses (b) to whom defendant sent a letter seeking to collect a credit card debt, (c) which letter contains the statement "Total May Include Other Debts Not Listed Here," (d) and was sent on or after a date one year prior to the filing of this action, (e) and prior to 20 days after the filing of this action.

5

24. The class is so numerous that joinder is impracticable. On information and belief, there are more than 50 members of the class.

25. There are questions of law and fact common to the members of the class, which common questions predominate over any questions that affect only individual class members. The predominant common question is whether Exhibit B violates the FDCPA.

26. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories

27. Plaintiff will fairly and adequately represent the interests of the class members. Plaintiff has retained counsel experienced in consumer credit and debt collection abuse cases.

28. A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and the class and against defendant for:

      a. Statutory damages;

      b. Attorney's fees, litigation expenses and costs of suit;

      c. Such other or further relief as the Court deems proper.

Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner

6

Michelle R. Teggelaar
EDELMAN, COMBS, LATTURNER
      & GOODWIN, L.L.C.
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## <u>JURY DEMAND</u>

Plaintiffs demand trial by jury.

_____
Daniel A. Edelman

J:\Case\pfg13.293\pleading\cmplt.wpd

7

# EXHIBIT A

## LIMITED POWER OF ATTORNEY

Done this $\underline{26}$ day of $\underline{\smash{May}}$ _____, 2004.

     1.    Pursuant to the Illinois Power of Attorney Act, 755 ILCS 45/1 *et seq.*, I, Katherine E. Hernandez, of 532 West St #8 Lockport, Illinois hereby appoint Fernando Hernandez, of 532 West St #8 Lockport, Illinois as my attorney-in-fact and as my agent to act for me and in my name (in any way I could act in person) solely with respect to any claims and litigation pursued or taken against any and all debt collectors, arising from or relating to the mailing of a collection letters; and with respect to no other matter whatsoever.

     2.    Fernando Hernandez, as my agent, and solely with respect to any claims and litigation arising from or relating to the mailing of any and all collection letters from any creditor or debt collector, is authorized to do the following:

        i)    institute, prosecute, defend, abandon, compromise, arbitrate, settle and dispose of any claim or litigation in favor of or against me or any of my property interests;

        ii)    collect and receive proceeds from any claim or settlement, and waive or release all of my rights;

        iii)    employ attorneys and others and enter into contingency agreements and other contracts as necessary in connection with litigation; and,

        iv)    in general, exercise all powers with respect to claims and litigation that I could exercise if present and under no disability.

     3.    Fernando Hernandez shall have the right by written instrument to delegate any or all of the preceding powers involving discretionary decision-making to any person or persons whom my agent may select, but such delegation may be amended or revoked by any agent (including any successor) named by me who is acting under this power of attorney at the time of reference.

     4.    Fernando Hernandez shall be entitled to reasonable compensation for services rendered as agent under this power of attorney.

     5.    This power of attorney shall become effective immediately upon my signature.

     6.    This power of attorney shall terminate immediately with respect to any particular collection letter upon the termination of any claim or litigation arising from or relating to the mailing of said collection letter; whether the termination of the claim or litigation comes

1

by the entry of a final judgment from which no appeal can be taken; by the release of my claims against the debt collector or creditor or by any other means

7.      I am fully informed as to all the contents of this limited power of attorney and understand the full import of this grant of powers to my agent, Fernando Hernandez.

Signed:          _____
                 Katherine E. Hernandez

State of Illinois      )
                       ) SS.
County of Cook         )

The undersigned, a notary public in and for the above county and state, certifies that Katherine E. Hernandez, known to me to be the same person whose name is subscribed as principal to the foregoing power of attorney, appeared before me and the additional witness in person and acknowledged signing and delivering the instrument as the free and voluntary act of the principal, for the uses and purposes therein set forth.

Dated:          5-26-04

Signed:         _____
                Notary Public

My commission expires on    9-10-07

```
"OFFICIAL SEAL"
Kelly R. Powell
Notary Public, State of Illinois
My Commission Exp. 09/10/2007
```

The undersigned witness certifies that Katherine E. Hernandez, known to me to be the same person whose name is subscribed as principal to the foregoing power of attorney, appeared before me and the notary public and acknowledged signing and delivering the instrument as the free and voluntary act of the principal, for the uses and purposes therein set forth. I believe him or her to be of sound mind and memory.

Dated:          5-26-04

Signed:         _____
                Witness

2

# EXHIBIT B



**PFG OF MINNESOTA**
7825 Washington Ave S Ste 410
Minneapolis MN 55439-2409
ADDRESS SERVICE REQUESTED

**PFG OF MINNESOTA**

*Collector # 1-800-319-6346*

September 3, 2004

PFG OF MINNESOTA
7825 Washington Ave S Ste 410
Minneapolis MN 55439-2409

#BWNDLHV   128753   3030
#AM0566/7#   AM0566-A

KATHY HERNANDEZ
532 West St Apt 8
Lockport IL 60441-2682

MEMBER



Reference #:   AM0566
Total Due:   $1074.23*
* Total May Include Other Debts Not Listed Here

**A C A**
INTERNATIONAL
The Association of Credit
and Collection Professionals

 **CHECK BY PHONE**
IS ACCEPTED

***Detach Upper Portion and Return with Payment***

## YOUR ACCOUNT HAS BEEN RECEIVED FOR COLLECTION

| Creditor | Account # | Principal | Interest | Cost |
|---|---|---|---|---|
| FINGERHUT / JEFFERSON CAPITAL | 8050051824464B51 | 1074.23 | 0.00 | 0.00 |

**Total: $1074.23***
* Total May Include Other Debts Not Listed Here

Your account has been assigned to this agency for collection. Please contact our office to resolve this account.

Sincerely,
*PFG of Minnesota*
1-800-319-6346

## Important Information

Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request this office in writing within 30 days after receiving this notice this office will provide you with the name and address of the original creditor, if different from the current creditor.

This letter is an attempt to collect a debt, and any information obtained will be used for that purpose. This communication is from a debt collector. This collection agency is licensed by the State of Minnesota Department of Commerce.

ICSPINN01A

Hours of Operation: Monday - Friday 7a.m to 11p.m CST ♦ Saturday 8a m to 12p m CST ♦ Sunday 4p m to 8p m CST

# APPENDIX B

Page 1

Commercial Law Bulletin May, 2002 / June, 2002

1 of 1 DOCUMENT

Copyright 2002 Bell & Howell Information and Learning
ABI/INFORM
Copyright 2002 Commercial Law League of America May/
Commercial Law Bulletin

May, 2002 / June, 2002

**SECTION:** Vol. 17, No. 3; Pg. 8-12; ISSN: 08888000

**B &H-ACC-NO:** 128557061

**DOC-REF-NO:** CLL-2048-10

**LENGTH:** 2048 words

**HEADLINE:** Debt buying and selling: My how you've grown

**BYLINE:**

Abby Clement is a business writer in Orlando, Florida.

**ABSTRACT:**

Born in the late 1980s, the debt sales industry is growing up and entering a new stage of life. No longer small with just a few players, the industry has experienced significant growth in the number of participants as well as the amount of debt that is bought and sold. This business has evolved from one where big profits could be made with relative ease to one in which only those who are smart, swift and sure-footed can regularly make money. It is not an industry for the faint of heart of unprepared. Advice on investing in this market is presented: 1. What should be paid for bad debt. 2. How debt is bought and sold. 3. Whether an investor should buy bad debt. 4. The future of debt sales.

**BODY:**

TThe infant has become a teenager. Born in the late 1980s, the debt sales industry is growing up and entering a new stage of life. No longer small with just a few players, the industry has experienced significant growth in the number of participants as well as the amount of debt that is bought and sold. It has seen some large companies come on the scene quickly-and almost as quickly crash and burn with a spectacular flair a failed dot-com would envy.

This business has evolved from one where big profits could be made with relative ease to one in which only those who are smart, swift and sure-footed can regularly make money On a positive note, the players have recognized the need for self-regulation and developed standards to promote fairness and ethical operations.

Even so, barriers to entry are low. For example, there are no licensing or registration requirements with any governmental agencies. The industry receives a tremendous amount of interest from those seeking to make the quick big hit and collection entities seeking to even out the peaks and valleys of their collection business.

The debt sales industry emerged when the government liquidated the assets of the distressed savings and loans in the mid-1980s. By late in that decade, other lenders adopted the innovative strategy of selling their non-performing accounts.

Powerful and affordable computers combined with software applications that allow for the easy manipulation of data and the ability to send large amounts of data instantaneously over the Internet have added another set of tools to those in the debt sales industry. These factors impact the pricing, the way debt is bought and sold, help to make entry easier and have spawned whole new businesses devoted to the debt sales marketplace,

Commercial Law Bulletin May, 2002 / June, 2002

Precise figures on the size of the market are not available, however, industry sources estimate the amount of fresh debt at between $30 billion and $34 billion for each of the years 2000 and 2001. Fresh debt is defined as charged-off receivables sold by the issuer that originated the loans. However, it is very common for debt to be sold, worked, repackaged and resold time and time again.

Is this a business you should consider? There money to be made, but it's not an industry for the faint of heart or unprepared.

Understand what debt you are buying

It is crucial that a debt buyer understand what is being pruchased. Some important questions to ask include:

To what extent has the debt been worked by the originator of the loan?

Has a third party collector had a crack at the debt as well?

Has the portfolio been cherry-picked with the most collectible debt already collected?

Is there documentation available from all stages in the life of the debt and collection efforts?

How well has the debt been scribbed? (i.e. checked for bankruptcies, deceases, etc.)

If you need to sue to collect can you get the required documents to win?

How much to pay is fundamental to making a profit. To the uninitiated, the price of merely pennies on the dollar sounds low. However, the market for debt sales has become much more sophisticated and certainty has been added to the pricing model.

During the 1990s, Oklahoma-based Commercial Financial Services (CFS) hit the scene with a big splash. CFS bought and collected charged-off credit-card receivables. The company also repackaged them as bonds creating a several hundred million dollar business. Because CFS dealt in such large numbers and paid significant premiums for debt over what was previously the norm, it effectively raised the level of pricing sellers came to expect from buyers of their charged-off receivables.

Common sense and the experience of those who had been in the collections or debt buying business for years questioned how CFS could make money paying so much for the debt. Historical collection rates were no secret in the industry and many wondered how CFS was doing it. CFS was anonymously accused of inflating collection rates and the Securities and Exchange Commission began investigating. Bondholders' suits were filed. CFS filed for bankruptcy and ultimately closed down, leaving a legacy of higher price expectations in the minds of debt sellers. It has taken a couple of years for the marketplace to come off of the premium levels paid by CFS and others in their heyday.

The result is that pricing for fresh chargeoffs hit a peak of 11 to 12 cents on the dollar during the CFS days. By the beginning of 2001, prices for similar types of debt had dropped to as low 4.5 cents. As the year went on, the price steadily rose to 6.5 cents. Although there was a dip after the attacks of September 11, the price by the end of the year was again in the 6.25 cents to 6.5 cents range for fresh chargeoffs. These prices are more in line with what the industry saw a decade ago.

Lower prices are a two-edged sword. Debt buyers obviously are happy However, debt sellers are reconsidering their options. At that pricing level, it may make sense to work the debt more in-house or place it for collection with a third-party collector in order to skim the cream before placing it for sale. So while the price for fresh chargeoffs is more realistic, the quality of the fresh chargeoffs may not be as good.

Technology has helped buyers to overcome some of these quality concerns.

Scoring software-some applying sophisticated behavioral models-is being used with increasing frequency. Massive databases that are continually updated with information about debtors are also being used. The Internet, coupled with the availability and ease of use of spreadsheet and database software applications, helped change the pricing model significantly as well.

How is debt bought and sold?

In the early days of debt sales, and in fact until only about two years ago, transactions were relationship based. Virtually every transaction was arranged through a broker. The process involved personal relationships facilitated by the intermediary. Communications were in person or by phone or fax. Given the back and forth nature of the process, it

Commercial Law Bulletin May, 2002 / June, 2002

might typically take a month or more to complete a deal. Today, billions of dollars of sales happen electronically through a variety of Internet-based facilitators of the debt buying and selling process.

Some provide a mechanism to review portfolios and facilitate a bidding mechanism. Others are sites where information about what is available can be reviewed or those interested in selling can post their portfolios, but do not provide the auction function. Some not only provide an opportunity for buyers and sellers to get together but also allow third party collection entities the opportunity to bid for collection business. Should you buy bad debt?

Just as the process has changed, who buys debt has changed over the years as well. Early in the industry's history, debt buyers were entrepreneurs. They tended to have a relationship with a third-party collection entity in order to collect the debt. Or they were entrepreneurs whose business model was to buy and resell the debt without any attempt at collecting it. While entrepreneurs continue to make up a large portion of the marketplace, collection attorneys and to a lesser degree, collection agencies, are buying debt. The structure typically involves the creation of a separate entity that actually does the buying. This new entity then contracts with the law firm or the collection agency to provide collection services on the debt.

The reasons law firms are beginning to become buyers of bad debt include a steadily diminishing base of collection clients and claims coupled with downward pressure on fees by creditors and agencies alike. Owning debt and devoting firm resources to collecting it pushes all the results directly to the bottom line. In a recent issue of Collections and Credit Risk magazine, Warren Rosenfeld, vice president for legal operations for NCO Financial Services headquartered in Horsham, PA, offered these tips for attorneys who might be thinking about buying bad debt:

Start small; your first purchase should be with funds you can afford to lose.

Buy debt only in those jurisdictions where you are currently practicing. Most purchased debt will have to be sued, so buy where you can do the suing.

Do not buy prime debt. As long as the debt has never been sued and is within statute, it is prime to you. Having another vendor work the portfolio, even for a couple of years, helps keep the price of the portfolio low.

Buy the type of debt that you feel comfortable collecting, but buy it as a tertiary portfolio. It's even better if you can buy this type of debt from an exiting client, because then you've had some experience with the liquidation rates and documentation of that creditors' portfolio.

Make certain that the seller will reimburse you, or offer you replacement accounts, for those that were bankrupt, or already discharged at the time of your purchase.

Make certain that you have a strong clause in your purchase contract to permit you access to business records of the original creditor, as well as to copies of assignments or bills or sale to vendors that purchased the portfolio before you.

Despite Rosenfeld's suggestion that you buy debt in your own jurisdiction, that may not be as easy or cheap as buying a national portfolio. And although there are tools that allow for buyers and sellers to be more efficient in pricing and due diligence, credibility and trust between the parties is still an important factor.

Original sellers of debt want to be certain that whoever they are selling to will have the financial ability to honor the contract, not violate collection laws that could bring liability to the seller and have the capacity to service the debt. Most original large sellers of debt prefer to sell their entire portfolio on a national basis to one buyer. As a result, those who want to buy a single state are forced to deal with resellers resulting in paying a higher price and being one more step removed from the status of fresh chargeoffs.

Future of debt sales

What is the future of the bad debt sales industry? According to Standard & Poor, chargeoffs could be as much as 8 percent of receivables by the end of this year. Personal bankruptcies are again increasing and are nearing 1.5 million for the 2001 fiscal year. The recession of late 2001 increased the amount of bad debt as well. Consolidation of financial institutions is helping to bring more bad debt to market. Fewer resources are provided to manage these assets and removing them from the company's books through a sale is an attractive option.

In an article published in the January 2002 issue of Business Credit magazine, David Schmidt notes that the debt marketplaces are beginning to handle performing assets as well as non-performing ones. "All trends are pointing to the day when receivables are looked upon as just another marketable commodity," he writes.

Finally, added evidence of the growth of the debt sales industry can be found in the Philippines. Lehman Brothers is purchasing hundreds of millions of dollars (U.S.) in non-performing loans of Philippine banks. According to Tony

Commercial Law Bulletin May, 2002 / June, 2002

Lopez writing in the January 25, 2002 issue of The Manila Times, "About [20 percent of all] loans extended by the banks cannot be repaid anymore. The total is a whopping 280 billion Philippine dollars." Lehman Brothers has offered 30 cents on the dollar for unpaid loans and has allocated $1 billion US for the purchase of bad debt.

## BIBLIOGRAPHY:

RESOURCES

Education about buying or seng debt

Before you begin buying bad debt, consider taking the Buyer/Seller 101 Training Course  Presented by Dennis and Judy Hammond, the program is now available online at a cost of $695. For more information, visit the Debt Marketplace Web site at www.debtmarketplace.com

Lists of lenders who have bad debt

SMR Research Corporation

300 Valentine Street

Hackettstown, NJ 07840

908-852-7677

Fax: 908-852-6884

www.smrresearch.com

Provides excel spreadsheets containing information about each of the 14,000 plus institutions that have delinquent or charged off debt. Information includes:

full mailing address

dollars of loans that are highly delinquent

dollars of loans that were charged off, year-to-date

total dollars of bad debt

types of loans

Industry Association

Debt Buyers Association

10440 Pioneer Boulevard

Suite 2

Santa Fe Springs, CA 90670

562-903-7222

fax: 562-903-7277

www.debtbuyers.com

Industry Information

The Debt Marketplace, Inc. 10440 Pioneer Blvd., Suite 2 Santa Fe Springs, CA 906708233

562-903-7220

Fax 562-903-7277

www.debtmorketplace.com

Electronic forwarding of collection claims

YouveGotClaims.com

Commercial Law Bulletin May, 2002 / June, 2002

170 Changebridge Road;

Suite A4-2

Montville, NJ 07045

800-542-0204

fax: 781-207-0219

www.youvegotclaims.com

Electronic Debt Exchanges

E-Debt Financial Services, Inc.

525 N. Cleveland-Massillon Rd.

Akron, OH 44333

877-353-3328

fax: 330-670-8447

www.E-Debt.com

Debt Futer

NAREX Inc.

25188 Genesee Trail Road,

Suite 200

Golden, Colorado 80401

303.526.4000

fax: 303.526.5130

www.narex.com

**GRAPHIC:** IMAGE ILLUSTRATION

**SIDEBAR:**

RULE OF THUMB

An industry rule of thumb is that a buyer should collect three times the cost of the portfolio:

one to cover the cost of the portfolio

one to cover the cost of collecting the portfolio

one for profit

SOME TERMS YOU SHOULD KNOW

CHARGEOFF: to treat as a loss or expense.

CHARGEOFF ACCOUNT or RECEIVABLE: an account or receivable that has been charged off as a loss on the books and records of the seller as uncollectable in accordance with practices and applicable with federal regulations.

CHARGEOFF DATE: the date on which the receivable is treated as a loss or expense against the seller's books.

CHARGEOFF, FRESH: a chargeoff account that: (a) is sold or purchased within 30 days of the originator's chargeoff date, (b) the debtor may have been contacted by a direct employee of the originator, and (c) the debtor has not been contacted for the purpose of collections by any third party representative, on behalf of the originator, as part of an 'early-out' or 'cure' program.

Commercial Law Bulletin May, 2002 / June, 2002

CHARGEOFF, NEW. a chargeoff account that: (a) is sold or purchased within 30 days of the originator's chargeoff date, (6) the debtor may have been contacted by a direct employee of the originator, and (c) the debtor may have been contacted for the purpose of collections by a third party representative, on behalf of the originator as part of an 'early-our' or 'cure' program.

CHARGEOFF, PRIMARY PLACEMENT: a chargeoff account that: (a) is sold or purchased after recall from a primary placement collection agency or attorney, lb) the debtor may or may not have been contacted for the purpose of collections by any third party representative, on behalf of the originator, as part of an learly-oa or 'cure' program, (c) or the account is being resold by a debt buyer who has made an attempt to contact the debtor, either directly or through a representative, for the purpose of collecting the debt and where the account was defined as a new chargeoff or fresh chargeoff account at the time of purchase by the debt buyer selling the account.

CHARGEOFF, SECONDARY PLACEMENT a chargeoff account that: (a)

is sold or purchased after recall from a secondary placement collection agency or attorney, (b) the debtor may or may not have been contacted for the purpose of collections by any third party representative, on behalf of the seller, as part of an 'early-out' or 'cure' program, (c) or the account is being resold by a debt buyer who has made an attempt to contact the debtor, either directly or through a representative, for the purpose of collecting the debt and where the account was defined as a primary placement chargeoff account at the time of purchase by the **debt** buyer selling the account.

CHARGEOFF, **TERTIARY PLACEMENT.** a chargeoff account that: (a) is sold or purchased after recall from a tertiary placement collection agency or attorney, lb) the Debtor may or may not have been contacted for the purpose of collections by any third party representative, on behalf of the seller, as part of an ,early-out' or 'cure' program, (c) or the account is being resold by a debt buyer who has made an attempt to contact the debtor, either directly or through a representative, for the purpose of collecting the debt and where the account was defined as a secondary placement chargeoff account at the time of purchase by the debt buyer selling the account,

CHARGEOFF, WAREHOUSE or ARCHIVE: (aj a chargeoff account that is sold or purchased after the account has been in storage and not received any collection activity for more than 6 months, lb) a chargeoff account that is sold or purchased after being placed with a quadinary placement collection agency or attorney, (cj or the account is being resold by a debt buyer who has made an attempt to contact the debtor, either directly or through a representative, for the purpose of collecting the **debt** and where the account was defined as a **tertiary placement** chargeoff account at the time of purchase by the **debt** buyer selling the account.

CHARGEOFF, ZERO AGENCY: a chargeoff account that. (a) is sold or purchased within 30 days of the originator's chargeoff date, lb) the

debtor may have been contacted by a direct employee of the originator, (c) the debtor has not been contacted for the purpose of collections by any third party representative, on behalf of the originator, as part of an 'early-out or 'cure' program, and Id) the account has not been bought or owned by a debt buyer who has made an attempt to contact the debtor, either directly or through a representative, for the purpose of collecting the debt.

DEFICIENCY BALANCE: (a) an amount that is lacking or inadequate, a shortage, (b) the difference between the original loan amount plus interest less payment to date and net recovery from the auction or sale of the asset.

DEFICIENCY, AUTO: in respect to an auto loan, the difference between the original loan amount plus interest less payment to date and net recovery From the auction or sale of the secured vehicle or property.

DEFICIENCY, MORTGAGE: in respect to a home or real property loan, the difference between the original loan amount plus interest less payment to date and net recovery from the auction or sale of the secured property.

INELIGIBLE ACCOUNT: (also see Non-Collectable Account or Uncollectable Account) (a) any account that is: (i) bankrupt (as determined by the Clerk of the Bankruptcy Court stamp), (ii) deceased (as determined by the date of death), (iii) fraud (as determined by the date the fraud charge was made), and (iv) settled (the settlement was received by seller prior to the closing date), (b) any account which has become uncollectable because: (ij the cardholder voluntarily or involuntarily became subject to bankruptcy proceedings before the closing date; (ii) the seller charged-off the account as a fraudulent account; (iii) any other reason which makes the account legally uncollectable, provided, that such circumstances occurred prior to the date of the closing hereunder, except for accounts on which on which the applicable statute of limitations has

Commercial Law Bulletin May, 2002 / June, 2002

run; (iv) deceased accounts where the date of death was prior to the closing date; or (v) any account which is determined as being handled by a collection agency or attorney either through sale or assignment and sold to purchaser in error because seller did in fact recall the account or any account retained by seller, or any account that has been archived; (vi) any account subject to legal guardianship and custodianship.

OFFICER CERTIFICATE: a certificate from an officer of a party (or, with respect to the buyer, of the servicer) certifying that (i) each of the obligations required to be performed by such party on or prior to the applicable closing date pursuant to the terms of the agreement has been duly performed and (ii) all representations and warranties of such party made under the agreement were true and correct as of the date of the agreement.

RE-AGED ACCOUNT: an account that is brought to a current status, even through the total past due amount has not been paid. Typically, the delinquency status is eliminated from the account (either manually or automated) after the customer has paid a predetermined amount, such as three minimum payments (usually two percent of the account balance each month) or one lump sum payment (usually the equivalent of the three minimum payments or six percent of the account balance each month). There is typically a maximum number of 're-ages' in the life of an account that is established by company policy.

RECOVERY RATE: the calculated percentage (based on the gross dollars of the original chargeoff pool of accounts including fraud, deceased, bankruptcies and disputes) of the gross dollars paid by the debtors to the owner(s) of the debt.

RECOVERY RATE CALCULATION: Gross dollars paid divided by gross dollars of chargeoff pool, see Recovery Rate.

Source: Debt Buyers Association

ETHICS IN DEBT BUYING

The Debt Buyers Association has established a Code of Ethics including a procedure for internal enforcement. Some of the key requirements include:

 comply with the intent of the Fair Debt Collection Practices Act (FDCPA), the Fair Credit Reporting Act (FCRA), or any more stringent laws within the area being serviced

maintain a sufficiently strong financial position to reasonably assure the firm's continued operation

always protect the interests of the clients

compete in a fair and honorable manner, never publicly attacking the reputation of a competitor

avoid deceptive practices, statements, or materials which would deceive consumers

**LOAD-DATE:** July 18, 2002

# APPENDIX C

# 2001

Department of the Treasury
**Internal Revenue Service**

# Instructions for Forms 1099-A and 1099-C

*Section references are to the Internal Revenue Code.*

## An Item To Note

In addition to these specific instructions, you should also use the **2001 General Instructions for Forms 1099, 1098, 5498, and W-2G.** Those general instructions include information about:

- Backup withholding
- Magnetic media and electronic reporting requirements
- Penalties
- When and where to file
- Taxpayer identification numbers
- Statements to recipients
- Corrected and void returns
- Other general topics

You can get the general instructions from the IRS Web Site at **www.irs.gov** or by calling 1-800-TAX-FORM (1-800-829-3676).

## Specific Instructions for Form 1099-A

File **Form 1099-A,** Acquisition or Abandonment of Secured Property, for each borrower if you lend money in connection with your trade or business and, in full or partial satisfaction of the debt, you acquire an interest in property that is security for the debt, or you have reason to know that the property has been abandoned. You need not be in the business of lending money to be subject to this reporting requirement.

### Coordination With Form 1099-C

If, in the same calendar year, you cancel a debt in connection with a foreclosure or abandonment of secured property, it is not necessary to file both Form 1099-A and **Form 1099-C,** Cancellation of Debt, for the same debtor. You may file Form 1099-C only. You will meet your Form 1099-A filing requirement for the debtor by making entries in boxes 5 and 7 on Form 1099-C. You may file both Forms 1099-A and 1099-C; if you do, make no Form 1099-A related entries in boxes 5 and 7 on Form 1099-C. See the instructions for Form 1099-C on page AC-2.

### Property

Property means any real property (such as a personal residence), any intangible property, and tangible personal property except:

- No reporting is required for tangible personal property (such as a car) held only for personal use. However, you must file Form 1099-A if the property is totally or partly held for use in a trade or business or for investment.

- No reporting is required if the property securing the loan is located outside the United States and the borrower has furnished the lender a statement, under penalties of perjury, that the borrower is an exempt foreign person (unless the lender knows that the statement is false).

### Who Must File

In addition to the general rule specified above, the following rules apply.

**Multiple owners.** If there are multiple owners of undivided interests in a single loan, such as in pools, fixed investment trusts, or other similar arrangements, the trustee, record owner, or person acting in a similar capacity must file Form 1099-A on behalf of all the owners of beneficial interests or participations. In this case, only one form for each borrower must be filed on behalf of all owners with respect to the loan. Similarly, for bond issues, only the trustee or similar person is required to report.

**Governmental unit.** A governmental unit, or any of its subsidiary agencies, that lends money secured by property must file Form 1099-A.

**Subsequent holder.** A subsequent holder of a loan is treated as the lender for purposes of the reporting requirement for events occurring after the loan is transferred to the new holder.

**Multiple lenders.** If more than one person lends money secured by property and one lender forecloses or otherwise acquires an interest in the property and the sale or other acquisition terminates, reduces, or otherwise impairs the other lenders' security interests in the property, the other lenders must file Form 1099-A for each of their loans. For example, if a first trust holder forecloses on a building, and the second trust holder knows or has reason to know of such foreclosure, the second trust holder must file Form 1099-A for the second trust even though no part of the second trust was satisfied by the proceeds of the foreclosure sale.

### Abandonment

An abandonment occurs when the objective facts and circumstances indicate that the borrower intended to and has permanently discarded the property from use. You have "reason to know" of an abandonment based on all the facts and circumstances concerning the status of the property. You will be deemed to know all the information that would have been discovered through a reasonable inquiry when, in the ordinary course of business, you become aware or should become aware of circumstances indicating that the property has been abandoned. If you expect to commence a foreclosure, execution, or similar sale within 3 months of the date you had reason to know that the property was abandoned, reporting is required as of the date you acquire an interest in the property or a third party purchases the property at such sale. If you expect to but do not commence such action within 3 months, the reporting requirement arises at the end of the 3-month period.

### Statements to Borrowers

If you are required to file Form 1099-A, you must provide a statement to the borrower. Furnish a copy of Form 1099-A or an acceptable substitute statement to each borrower. For more information about the requirement to furnish a statement to the borrower, see part H in the **General Instructions for Forms 1099, 1098, 5498, and W-2G.**

### Box 1. Date of Lender's Acquisition or Knowledge of Abandonment

Enter the date of your acquisition of the secured property or the date you first knew or had reason to know that the property was abandoned. An interest in the property generally is acquired on the earlier of the date title is transferred to the lender or the date possession and the burdens and benefits of ownership are transferred to the lender. If an objection period is provided by law, use the date the objection period expires. If you purchase the property at a sale held to satisfy the debt, such as at a foreclosure or execution sale, use the later of the date of sale or the date the borrower's right of redemption expires.

For an abandonment, enter the date you knew or had reason to know that the property was abandoned unless you expect to commence a foreclosure, execution, or similar action within 3 months, as explained earlier. If a third party purchases the property at a foreclosure, execution, or similar sale, the property is treated as abandoned, and you have reason to know of its abandonment on the date of sale.

### Box 2. Balance of Principal Outstanding

Enter the balance of the debt outstanding at the time the interest in the property was acquired or on the date you first knew or had reason to know that the property was abandoned. Include only unpaid principal on the original debt. Do not include accrued interest or foreclosure costs.

### Box 3. Unused Box

Make no entry in this box.

### Box 4. Fair Market Value of Property

For a foreclosure, execution, or similar sale, enter the fair market value (FMV) of the property. (See Temporary Regulations section 1.6050J-1T, Q/A-32.) Generally, the gross foreclosure bid price is considered to be the FMV. If an abandonment or voluntary conveyance to the lender in lieu of foreclosure occurred and you checked "Yes" in box 5, enter the appraised value of the property. Otherwise, make no entry in this box.

### Box 5. Was Borrower Personally Liable for Repayment of the Debt?

Enter an "X" in the applicable box to indicate whether the borrower was personally liable for repayment of the debt at the time the debt was created or, if modified, at the time of the last modification.

### Box 6. Description of Property

Enter a general description of the property. For real property, generally you must enter the address of the property, or, if the address does not sufficiently identify the property, enter the section, lot, and block. For personal property, enter the applicable type, make, and model. For example, describe a car as "Car—2000 Buick Regal." Use a category such as "Office Equipment" to describe more than one piece of personal property, such as six desks and seven computers. Enter "CCC" for crops forfeited on Commodity Credit Corporation loans.

---

## Specific Instructions for Form 1099-C

File **Form 1099-C,** Cancellation of Debt, for each debtor for whom you canceled a debt owed to you of $600 or more only if:

   **1.** You are an entity described under **Who Must File** below and

   **2.** An identifiable event has occurred. It does not matter whether the actual cancellation is on or before the date of the identifiable event. See **When Is a Debt Canceled?** on page AC-3.

   Form 1099-C must be filed regardless of whether the debtor is required to report the debt as income.

   The debtor may be an individual, corporation, partnership, trust, estate, association, or company.

   Do not combine multiple cancellations of a debt to determine whether you meet the $600 reporting requirement unless the separate cancellations are under a plan to evade the Form 1099-C requirements.

### Coordination With Form 1099-A

If, in the same calendar year, you cancel a debt in connection with a foreclosure or abandonment of secured property, it is not necessary to file both **Form 1099-A,** Acquisition or Abandonment of Secured Property, and Form 1099-C for the same debtor. You may file Form 1099-C only. You will meet your Form 1099-A filing requirement for the debtor by making entries in boxes 5 and 7 on Form 1099-C. You may file both Forms 1099-A and 1099-C; if you do, make no Form 1099-A

related entries in boxes 5 and 7 on Form 1099-C. See the instructions for Form 1099-A on page AC-1 and **Box 5** and **Box 7** on page AC-4.

### Who Must File

File Form 1099-C if you are one of the following:

   **1.** A financial institution described in section 581 or 591(a) (such as a domestic bank, trust company, building and loan or savings and loan association).

   **2.** A credit union.

   **3.** A Federal Government agency including:

   **a.** A department,

   **b.** An agency,

   **c.** A court or court administrative office, or

   **d.** An instrumentality in the executive, judicial, or legislative branch of the Government, including Government corporations.

   **4.** One of the following (or any successor or subunit of the following):

   **a.** Federal Deposit Insurance Corporation,

   **b.** Resolution Trust Corporation,

   **c.** National Credit Union Administration,

   **d.** Any military department,

   **e.** U.S. Postal Service, or

   **f.** Postal Rate Commission.

   **5.** Any organization a significant trade or business of which is the lending of money, such as a finance company or credit card company (whether or not affiliated with a financial institution).

   Also file Form 1099-C if you are a corporation that is a subsidiary of a financial institution or credit union, but only if, because of your affiliation, you are subject to supervision and examination by a Federal or state regulatory agency.

**Multiple creditors.** If a debt is owned (or treated as owned for Federal income tax purposes) by more than one creditor, each creditor that is described under **Who Must File** above must issue a Form 1099-C if that creditor's part of the canceled debt is $600 or more. To meet this requirement, a lead bank, fund administrator, or other designee of the creditor may file a single Form 1099-C reporting the aggregate canceled debt or may file Form 1099-C for that creditor's part of the canceled debt. Use any reasonable method to determine the amount of each creditor's part of the canceled debt.

   Debt owned by a partnership is treated as owned by the partners and must follow the rules for multiple creditors.

**Pass-throughs and REMICs.** Until further guidance is issued, no penalty will apply for failure to file Form 1099-C, or provide statements to debtors, for a canceled debt held in a pass-through securitized debt arrangement or held by a real estate mortgage investment conduit (REMIC). A pass-through securitized debt arrangement is any arrangement in which one or more debts are pooled and held for 20 or more persons whose interests in the debt are undivided coownership interests that are freely transferable. Coownership interests that are actively traded personal property (as defined in Regulations section 1.1092(d)-1) are presumed to meet these requirements.

### Debt Defined

A debt is any amount owed to you including stated principal, stated interest, fees, penalties, administrative costs, and fines. The amount of debt canceled may be all or only part of the total amount owed. However, for a lending transaction, you are required to report only the stated principal. See **Exceptions** on page AC-3.

### When To File

Generally, file Form 1099-C for the year in which an identifiable event occurs. See **Exceptions** on page AC-3. If you cancel a debt before an identifiable event occurs, you may choose to file Form 1099-C for the year of cancellation. No further reporting is required even if a second identifiable event occurs on the same debt. Also, you are not required to file an additional or corrected Form 1099-C if you receive payment on a prior year debt.

## When Is a Debt Canceled?

A debt is canceled on the date an identifiable event occurs. An **identifiable event** occurs when the debt is canceled:

**1.** Under Title 11 of the U.S. Code (bankruptcy) (reportable only for business or investment debt; see **Exceptions** below).

**2.** Or extinguished making it unenforceable in a receivership, foreclosure, or similar Federal or state court proceeding.

**3.** Or extinguished when the statute of limitations for collecting the debt expires, or when the statutory period for filing a claim or beginning a deficiency judgment proceeding expires. Expiration of the statute of limitations is an identifiable event only when a debtor's affirmative statute of limitations defense is upheld in a final judgment or decision of a court and the appeal period has expired.

**4.** When the creditor elects foreclosure remedies that by law end or bar the creditor's right to collect the debt. This event applies to a mortgage lender or holder who is barred by local law from pursuing debt collection after a "power of sale" in the mortgage or deed of trust is exercised.

**5.** Due to a probate or similar proceeding.

**6.** Under an agreement between the creditor and the debtor to cancel the debt at less than full consideration if the last event necessary to cancel the debt has occurred.

**7.** Because of a decision or a defined policy of the creditor to discontinue collection activity and cancel the debt. A creditor's defined policy can be in writing or an established business practice of the creditor. A creditor's practice to stop collection activity and abandon a debt when a particular nonpayment period expires is a defined policy.

**8.** Because the nonpayment testing period expires. This event occurs when the creditor has not received a payment on the debt during the testing period. The testing period is a 36-month period ending on December 31 plus any time when the creditor was precluded from collection activity by a stay in bankruptcy or similar bar under state or local law. The creditor can rebut the occurrence of this identifiable event if **(a)** the creditor (or a third-party collection agency) has engaged in significant bona fide collection activity during the 12-month period ending on December 31 or **(b)** facts and circumstances that exist on January 31 following the end of the 36-month period indicate that the debt was not canceled. Significant bona fide collection activity does not include nominal or ministerial collection action, such as an automated mailing. Facts and circumstances indicating that a debt was not canceled include the existence of a lien relating to the debt (up to the value of the security) or the sale or packaging for sale of the debt by the creditor.

## Exceptions

You are not required to report on Form 1099-C the following:

**1. Certain bankruptcies.** You are not required to report a debt canceled in bankruptcy unless you know from information included in your books and records that the debt was incurred for business or investment purposes. If you are required to report a business or investment debt canceled in bankruptcy, report it for the later of **(a)** the year in which the amount of canceled debt first can be determined or **(b)** the year in which the debt is canceled in bankruptcy. A debt is incurred for business if it is incurred in connection with the conduct of any trade or business other than the trade or business of performing services as an employee. A debt is incurred for investment if it is incurred to purchase property held for investment (as defined in section 163(d)(5)).

**2. Interest.** You are not required to report interest. However, if you choose to report interest as part of the canceled debt in box 2, you must show the interest separately in box 3.

**3. Nonprincipal amounts.** For a lending transaction, you are not required to report any amount other than stated principal. A lending transaction occurs when a lender loans money to, or makes advances on behalf of, a borrower (including revolving credit and lines of credit). Nonprincipal amounts include penalties, fines, fees, and administrative costs. However, for a nonlending transaction, report any of these amounts that are included in the debt.

**4. Foreign debtors.** Until further guidance is issued, no penalty will apply if a financial institution does not file Form 1099-C for a debt canceled by its foreign branch or foreign office for a foreign debtor provided all the following apply:

**a.** The financial institution is engaged in the active conduct of a banking or similar business outside the United States.

**b.** The branch or office is a permanent place of business that is regularly maintained, occupied, and used to carry on a banking or similar financial business.

**c.** The business is conducted by at least one employee of the branch or office who is regularly in attendance at the place of business during normal working hours.

**d.** The indebtedness is extended outside the United States by the branch or office in connection with that trade or business.

**e.** The financial institution does not know or have reason to know that the debtor is a U.S. person.

**5. Related parties.** Generally, a creditor is not required to file Form 1099-C for the deemed cancellation of a debt that occurs when the creditor acquires the debt of a related debtor, becomes related to the debtor, or transfers the debt to another creditor related to the debtor. However, if the transfer to a related party by the creditor was for the purpose of avoiding the Form 1099-C requirements, Form 1099-C is required. See section 108(e)(4).

**6. Release of a debtor.** You are not required to file Form 1099-C if you release one of the debtors on a debt as long as the remaining debtors are liable for the full unpaid amount.

**7. Guarantor or surety.** You are not required to file Form 1099-C for a guarantor or surety. A guarantor is not a debtor for purposes of filing Form 1099-C even if demand for payment is made to the guarantor.

## Multiple Debtors

For debts of $10,000 or more incurred after 1994 that involve debtors who are jointly and severally liable for the debt, you must report the entire amount of the canceled debt on each debtor's Form 1099-C. Multiple debtors are jointly and severally liable for a debt if there is no clear and convincing evidence to the contrary. If it can be shown that joint and several liability does not exist, a Form 1099-C is required for each debtor for whom you canceled a debt of $600 or more.

For debts incurred before 1995 and for debts of less than $10,000 incurred after 1994, you must file Form 1099-C only for the primary (or first-named) debtor.

If you know or have reason to know that the multiple debtors were husband and wife who were living at the same address when the debt was incurred, and you have no information that these circumstances have changed, you may file only one Form 1099-C.

## Recordkeeping

If you are required to file Form 1099-C, you must retain a copy of that form or be able to reconstruct the data for at least 4 years from the due date of the return.

## Requesting TINs

You must make a reasonable effort to obtain the correct name and taxpayer identification number (TIN) of the person whose debt was canceled. You may obtain the TIN when the debt is incurred. If you do not obtain the TIN before the debt is canceled, you must request the debtor's TIN. Your request must clearly notify the debtor that the IRS requires the debtor to furnish its TIN and that failure to furnish such TIN subjects the debtor to a $50 penalty imposed by the IRS. You may use **Form W-9,** Request for Taxpayer Identification Number and Certification, to request the TIN. However, a debtor is not required to certify his or her TIN under penalties of perjury.

## Statements to Debtors

If you are required to file Form 1099-C, you must provide a statement to the debtor. Furnish a copy of Form 1099-C or an

acceptable substitute statement to each debtor. For more information about the requirement to furnish a statement to the debtor, see part H in the **General Instructions for Forms 1099, 1098, 5498, and W-2G.** You have furnished a statement to the debtor if it is mailed to the debtor's last known address.

### Box 1. Date Canceled

Enter the date the debt was canceled. See **When Is a Debt Canceled?** on page AC-3.

### Box 2. Amount of Debt Canceled

Enter the amount of the canceled debt. See **Debt Defined** on page AC-2 and **Exceptions** on page AC-3. Do not include any amount the lender receives in satisfaction of the debt by means of a settlement agreement, foreclosure sale, etc.

### Box 3. Interest if Included in Box 2

Enter any interest you included in the canceled debt in box 2. You are not required to report interest in box 2. But if you do, you also must report it in box 3.

### Box 4. Unused Box

Make no entry in this box.

### Box 5. Debt Description

Enter a description of the origin of the debt, such as student loan, mortgage, or credit card expenditure. Be as specific as possible. If you are filing a combined Form 1099-C and 1099-A, also enter a description of the property.

### Box 6. Check for Bankruptcy

Enter an "X" in the checkbox if you are reporting a debt canceled in bankruptcy.

### Box 7. Fair Market Value of Property

Make an entry in this box only if you are filing a combined Form 1099-C and 1099-A. For a foreclosure, execution, or similar sale, enter the fair market value (FMV) of the property. Generally, the gross foreclosure bid price is considered to be the FMV. If an abandonment or voluntary conveyance to the lender in lieu of foreclosure occurred, enter the appraised value of the property.

# APPENDIX D

Dept 660
PO Box 4115
Concord, CA 94524

February 16, 2005

Address Service Requested

#BWNFTZF #PCG2072894705028#

|Ildluullilluulhulhllllluullhlulldllull

**IF PAYING USING CHECK BY PHONE PLEASE INCLUDE YOUR ABA AND ROUTING INFORMATION:**

IF PAYING BY MASTERCARD, VISA, DISCOVER, OR AMERICAN EXPRESS FILL OUT BELOW.

| Check Card Using For Payment | ☐ MASTERCARD | ☐ VISA | ☐ DISCOVER | ☐ AMERICAN EXPRESS |
|---|---|---|---|---|

| Reference # : DM3721 | Total Due : $76.03 | Statement Date: February 16, 2005 |
|---|---|---|
| Card Number | | Amount |
| Signature | | Exp. Date |

**PFG OF MINNESOTA**
7825 Washington Ave S Ste 410
Minneapolis, MN 55439-2409

|IdlulldalulldlluullilluulldalullllulldunllllludldI

---

***Detach Upper Portion and Return with Payment***

**We've Worked With Thousands Of People In Situations Similar To Yours.**

## How Can We Help You?

Your account has been assigned to this agency for collection.

How can we help you?

Here is what you can do next:



**ACA** INTERNATIONAL
The Association of Credit and Collection Professionals

1) Detach the upper portion of this letter and return with payment using the enclosed envelope.

    OR

2) Please contact our office at **1-888-228-4840** to explore the options that are available to you.

    OR

3) You may use any of the following services to pay:

| WESTERN UNION | QUICK COLLECT® |  |  |  | AMERICAN EXPRESS | **CHECK BY PHONE** IS ACCEPTED |

Sincerely,

*PFG OF MINNESOTA*
*Collector # 1-888-228-4840*

| Creditor | Account # | Principal | Interest | Cost |
|---|---|---|---|---|
| FIGI'S #38 | 204060834 | 76.03 | 0.00 | 0.00 |
| | | | | |
| | | Total.................> $76.03 | | |

Hours of Operation: Monday - Friday 7a.m. to 11p.m. CST • Saturday 8a.m. to 12p.m. CST • Sunday 4p.m. to 8p.m. CST

NOTICE:  SEE REVERSE SIDE FOR IMPORTANT CONSUMER INFORMATION

Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request this office in writing within 30 days after reviewing this notice this office will provide you with the name and address of the original creditor, if different from the current creditor.

This letter is an attempt to collect a debt, and any information obtained will be used for that purpose. This communication is from a debt collector. This collection agency is licensed by the State of Minnesota Department of Commerce.